**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **ELLA PATE CARSON,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:12-CV-25 (HL) |
| **WALGREEN INCOME PROTECTION PLAN FOR PHARMACISTS AND REGISTERED NURSES, and SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.,** | |
| Defendants. | |

**ORDER**

Before the Court are Defendants' Motion for Summary Judgment (Doc. 15-2) and Plaintiff's Motion for Judgment (Doc. 16). For the reasons stated below, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiff's Motion for Judgment.

This case arises from the decision by Defendant Sedgwick Claims Management Services, Inc. ("Sedgwick") to deny Plaintiff Ella Pate Carson's ("Plaintiff") application for a continuation of long-term disability ("LTD") benefits under the disability plan provided by Defendant Walgreen Income Protection Plan for Pharmacists and Registered Nurses. Plaintiff alleges that Sedgwick erroneously decided that she no longer qualified for LTD benefits and terminated her benefits in violation of the Employee Retirement Income Security Act of 1974,

29 U.S.C. § 1001 *et seq.* ("ERISA"). Defendants have responded that the termination decision was correct under a *de novo* standard, but even if not, it was still reasonable under the arbitrary and capricious standard. Because this case concerns ERISA claims, the Court will make findings of fact and conclusions of law under Federal Rule of Civil Procedure 52. Adams v. Hartford Life and Acc. Ins. Co., 694 F. Supp. 2d 1342, 1345 n.1 (M.D. Ga. 2010) (citing Davis v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1363 n.5 (11th Cir. 2008)).

## I.    FINDINGS OF FACT

In making findings of fact and conclusions of law under Rule 52, the Court must rely on the administrative record before Sedgwick,[1] the claim administrator in this case. Under the standard of review provided by the Eleventh Circuit, the Court looks to the facts before the claim administrator at the time it made its final decision. Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008). The parties do not dispute what should be included in the administrative record, and the Court will address Plaintiff's successful application for Social Security disability benefits that occurred after the administrative record had closed. The findings of fact here must consider the language of Plaintiff's LTD plan, the nature of her employment, and her claims for disability.

---

[1] For ease of reference, the Court will refer to the administrative record using "AR" followed by a three-digit page number. Thus, ADM-LTD-WAGSCarson000401 will be simply AR 401.

### A.    The Benefits Plan

Determining Plaintiff's claim for LTD benefits must begin with looking at the benefits plan itself. There is no dispute over what the plan says, only over how it should be applied to the Plaintiff. As a pharmacist at Walgreens, Plaintiff received coverage for LTD benefits under the Income Protection Plan for Pharmacists and Registered Nurses ("Plan") with an effective coverage date of June 1, 2007. (AR 520). Walgreens, functioning as the plan administrator, agreed to pay benefits for disability claims approved under the Plan. However, Walgreens appointed Sedgwick to serve as an independent, third-party claim administrator and determine the eligibility for benefits for any claims submitted under the Plan. (Doc. 15-4, pg. 6).[2] As the Plan stated, outside consultants might be hired to assist Sedgwick in making benefit determinations. (Doc. 15-4, pg. 15).

No party disputes that both Walgreens and Sedgwick, as the claim administrator, possessed discretionary authority under the Plan. (Compare Doc. 15-1, ¶4 with Doc. 21, ¶A). Sedgwick and Walgreens were authorized, "in their sole discretion," to interpret the Plan's language, determine the eligibility of claims, and adjudicate appeals. (Doc. 15-4, pg. 17). Sedgwick would normally operate alone to review claims up through two possible appeals, although

---

[2] When referring to the Plan, the Court will cite to Exhibit B to Defendants' Motion for Summary Judgment (Doc. 15-4). Plaintiff attached a copy of the Plan to her Motion for Judgment (Doc. 16-2) that is in a slightly different format from Defendants' exhibit; however, the operative language is the same.

Walgreens reserved the right to make a final determination if it chose to do so. (Doc. 15-4, pg. 16). Plaintiff has stipulated that Walgreens did not exercise this right here and that only Sedgwick handled her claim and appeals. (Compare Doc. 15-1, ¶5 with Doc. 21, ¶A).

Just as the Plan's delegation of authority is key, so too are its definitions. The Plan only provides coverage for employees who meet the Plan's particular definition for a disability. The Plan defines disability as follows:

> For the long-term disability period, "disabled" or "disability" means that, due to sickness, pregnancy, or accidental injury, you are prevented from performing one or more of the essential duties of your own occupation and are receiving appropriate care and treatment from a doctor on a continuing basis; and
>
> • for the first 18 months of long-term benefits, you are unable to earn more than 80% of your pre-disability earnings or indexed pre-disability earnings at your own occupation from any employer in your local economy; or
>
> • following that 18 month period, you are unable to earn more than 60% of your indexed pre-disability earnings from any employer in your local economy at any gainful occupation for which you are reasonably qualified, taking into account your training, education, experience, and pre-disability earnings.

(Doc. 15-4, pg. 6). "Own occupation" means "the activity that you regularly perform and that serves as your source of income....It may be a similar activity that could be performed with Walgreens or any other employer." (Doc. 15-4, pg. 7).

4

Even if initially approved for benefits, a person could lose the benefits if she later became capable of working. A claimant's benefits would cease "as soon as you are released to return to work on a regular, full-time basis, or you are no longer disabled as defined by this plan." (Doc. 15-4, pg. 7).

### B.   Plaintiff's Employment

Plaintiff was working as a pharmacist at Walgreens when she filed for LTD benefits. (AR 520, 648). In February 2011, a pharmacist's job at Walgreens entailed "assisting customers with pharmaceutical-related questions; filling prescriptions by…computer and phone…[;] manually compounding ingredients…; overseeing pharmacy technicians; and communicating with physicians." (AR 752). The physical demands included "continual walking and standing and some bending and reaching." (AR 752). Working as a pharmacist involved little physical demand but required proficiency "with simple, detailed, and complex instructions and job tasks." (AR 754). Plaintiff stopped working at Walgreens after August 14, 2009, and filed for disability benefits under the Plan. (AR 086)

### C.   Plaintiff's LTD Claim

After completing the 180-day period in which she received short-term disability benefits, Plaintiff sought LTD coverage beginning February 13, 2010. (AR 086). In support of her disability claim, Plaintiff provided a letter from Dr.

James Mossell, a rheumatologist and internist who was her primary care physician. Writing on December 21, 2009, Dr. Mossell indicated that Plaintiff suffered from osteoarthritis, seronegative inflammatory arthritis, fibromyalgia, and depression. According to Dr. Mossell, she would remain disabled for at least six months. (AR 743).

Prior to Dr. Mossell's letter, Plaintiff had been a patient at the Greenleaf Center ("Greenleaf"), a mental health facility connected to the South Georgia Medical Center in Valdosta, Georgia, from August 18-22, 2009. Plaintiff received treatment for major depressive disorder and suicidal ideations. Although Plaintiff had a history of depression and had been taking Cymbalta, she had been a pharmacist for thirty years and had never previously been admitted to a psychiatric facility or attempted suicide. Arriving at Greenleaf, she attributed her depression to recent reprimands at work for being forgetful and making mistakes. She had been diagnosed with fibromyalgia and struggled to concentrate, but she thought her job performance was consistent with the other pharmacists. The medications that Plaintiff was taking at the time of her admission to Greenleaf included Methotrexate, Hydrocodone, Meloxicam, Exelon, folic acid, Hyzaar, Cymbalta, Levothyroxine, Prilosec, and Baclofen. (AR 484, 488-89, 519-20, 648).

The Greenleaf staff sought to diagnose Plaintiff's medical issues and properly treat them. As for Plaintiff's physical condition, Dr. Dhanraj Padhiar, an

internist, diagnosed hypertension with hypertensive heart disease, hypothyroidism, osteoarthritis, fibromyalgia, gastroesophageal reflux disease, undifferentiated connective tissue disease, anemia, perennial rhinitis, depression, and obesity. (AR 492-94). However, Plaintiff denied any joint swelling, and a physical examination revealed full motor strength, normal range of joint motion, normal walking gait, and the capability of engaging in all physical activities except strenuous exercise. (AR 232-36, 492). Treatment notes from August 21-22 show she was not in pain and her depression was lessening. (AR 255, 262, 264).

Greenleaf's discharge summary of August 22, 2009 stated that Plaintiff had "responded very well to the treatment…[and] did not experience any adverse side effects from the medications." (AR 487). The only changes Greenleaf made to the medications Plaintiff was taking at the time of admission were to increase the Cymbalta dosage and end hydrocodone. (AR 486-87). She was in "good physical health with stable vital signs….She was hopeful and optimistic. Thinking was normal." (AR 487). There were no hallucinations or delusions, while her memory, judgment, and insight were intact. (AR 487). Although her Global Assessment Functioning ("GAF") score was estimated to be a 33 at the time of her admission to Greenleaf, her normal range was thought to be 55–60. In discharging Plaintiff from Greenleaf, Dr. Anil Gupta instructed her to follow up with him in a couple of weeks, begin individual counseling, and continue

receiving treatment for medical problems from her family physician. (AR 487, 490). There is no record of Plaintiff following up with Dr. Gupta or receiving individual counseling.

Plaintiff visited Dr. James Mossell on January 11, 2010 and chiefly complained of fecal incontinence. She had some joint swelling but no pain, and Dr. Mossell did not detect any synovitis or effusions. His general diagnoses were osteoarthritis, fibromyalgia, undifferentiated connective tissue disease that was stable, and depression that had improved. (AR 077). Blood tests on January 11 revealed an erythrocyte sedimentation rate ("sed rate" or "ESR") of 31 and a C-reactive protein ("CRP") level of 3.8. The normal ESR range is 0 to 30, and the CRP range is 0 to 4.9. (AR 080). The ESR and CRP tests suggest whether a patient is experiencing inflammation in her body and are used to diagnose arthritis, among other conditions.[3] Additionally, Plaintiff did a sleep study on January 19 that indicated mild obstructive sleep apnea, for which nutritional counseling, weight loss, and sleep medications were recommended. (AR 078).

Based on Plaintiff's medical records, Sedgwick approved her claim for LTD benefits from February 13 through April 30, 2010. (AR 086-87). Sedgwick,

---

[3] Information on ESR and CRP testing was obtained from *Sed rate (erythrocyte sedimentation rate)*, MAYO CLINIC, http://www.mayoclinic.com/health/sed-rate/MY00343 (last visited Aug. 23, 2013); *C-reactive protein test*, MAYO CLINIC, http://www.mayoclinic.com/health/c-reactive-protein/MY01018 (last visited Aug. 23, 2013); *Rheumatoid factor*, MAYO CLINIC, http://www.mayoclinic.com/health/rheumatoid-factor/MY00241 (last visited Aug. 23, 2013).

satisfied that Plaintiff's January 11 blood work had shown "evidence of continued active disease," decided that her medical conditions would cause sufficient chronic pain and inflammation to prevent her from working as a pharmacist. (AR 056). Sedgwick instructed Plaintiff to supplement her medical records prior to April 30 to have her benefits extended. (AR 086-87).

Accordingly, Plaintiff visited Dr. Mossell again on April 12, 2010. Her pain was rated at only a 2 on a scale of 1-10, and Dr. Mossell determined she was "doing well on her current medications" and had "good control of her inflammatory arthritis." (AR 090). She complained of morning stiffness lasting for an hour or two, but a musculoskeletal examination revealed "[g]ood mobility in all four extremities" with no active synovitis or joint effusions. (AR 090). Dr. Mossell's diagnoses were undifferentiated connective tissue disease that was well controlled, osteoarthritis, fibromyalgia, obesity, gastroesophageal reflux disease, and improved depression. He only altered Plaintiff's medications by switching her from Prilosec to Protonix for her reflux issues. (AR 090). Blood tests did not show abnormal levels of inflammation. (AR 091).

After reviewing Dr. Mossell's record from April 12, Sedgwick informed Plaintiff on May 18 that it was extending benefits through July 31, 2010. Sedgwick cautioned that any extension of benefits beyond July was conditioned on Plaintiff supplying additional medical records by July 23. (AR 093).

When Plaintiff was seen by Dr. Mossell again on July 20, she related "no complaints." (AR 096). Her weight was down to 215.8 pounds, and she exhibited no joint pain or swelling. Plaintiff was able to rest often. Dr. Mossell detected no signs of synovitis or effusions, but he nonetheless diagnosed gastroesophageal reflux disease, seronegative inflammation, obesity, and obstructive sleep apnea in addition to his diagnoses from the January 11 visit. (AR 096).  Plaintiff's CRP level was within the normal range, but her ESR was seven points high. (AR 098).

Deciding that Plaintiff's condition qualified as disabled under the Plan, Sedgwick notified Plaintiff on August 17 that her benefits had been approved through October 31, 2010. However, Plaintiff had to supplement her medical records by October 23 to receive future benefits. (AR 124).

In compliance with Sedgwick's request, Plaintiff submitted records from a laboratory test on October 8 and a visit to Dr. Mossell on November 3. Her ESR level was only slightly elevated, and her CRP level was normal. (AR 150). She complained of slight jaw pain on November 3, and Dr. Mossell diagnosed TMJ and told her to see a dentist. Plaintiff had limited joint pain but no swelling, and the doctor detected no active synovitis or effusions. Regardless of this observation, Dr. Mossell continued the same diagnoses from July 20 with the addition of TMJ. (AR 142).

In light of the November 3 examination by Dr. Mosell, on November 18 Sedgwick did extend Plaintiff's benefits through November 30, 2010, but internally noted that her file "[m]ay require PA [physician advisor] review depending on [treatment] for TMJ." (AR 041-42). Sedgwick subsequently learned that, on November 16, Plaintiff had been seen by Dr. Chris Hilliard, a dentist who removed Plaintiff's left bicuspids and recommended she get a mouth guard. However, Plaintiff could not afford to purchase the mouth guard. (AR 038-39).

Questioning whether Plaintiff continued to qualify as disabled under the Plan, Sedgwick sent Plaintiff's medical file to Dr. Dennis Payne, who is board certified in rheumatology and internal medicine, for an independent medical opinion. Sedgwick requested the independent medical review on December 29, 2010, and in the interim decided not to extend disability benefits to Plaintiff for December. (AR 036-37).

On December 24, Plaintiff admitted herself to Greenleaf for treatment of her depression. Plaintiff said that, suffering financial stress after she did not receive disability benefits for December and enduring a painful conversation with her son the previous night, she had placed a bag over her head and contemplated suicide before calling her sister. Greenleaf reviewed her current medications at admission and continued them, including Ambien for Plaintiff's complaints of insomnia. (AR 332, 601-02, 604, 606). Her arthritis and

fibromyalgia were stable, and the only ongoing problem was the TMJ. (AR 641, 700). Every day Plaintiff was at Greenleaf, her pain was rated a zero, and a physical examination revealed a normal walk; normal bones, muscles, joints, and extremities; and the capability to participate in all physical activities. (AR 626-30, 676-78, 680, 682, 684, 686). Plaintiff discussed returning to work to resolve her financial difficulties, and by the time she left on December 29, Greenleaf had raised her GAF score to 55 from the 30 at admission. (AR 603, 666, 669). At discharge, she was medically stable with normal thinking and no suicidal thoughts. (AR 602).

Plaintiff called Sedgwick on December 30 to relate her recent hospitalization at Greenleaf. (AR 036-37). Because Sedgwick had already sent Plaintiff's file to Dr. Payne, the records he reviewed did not include information relating to Plaintiff's hospitalization on December 24.

In following up with Dr. Anil Gupta, her psychiatrist, on January 4, Plaintiff displayed continued improvement. Her cognitive functions, judgment, and insight were all intact. There were no side effects to her medications; her concentration was normal. Although the "[p]sychosocial factor [of the financial stress] seemed to be playing a major role in maintaining symptoms," Plaintiff indicated that she had a job interview soon. (AR 169).

After reviewing Plaintiff's medical file, Dr. Payne reported back to Sedgwick on January 5, 2011 that Plaintiff could work as a pharmacist as of December 1, 2010. (AR 160). Some of her blood work indicated possible inflammation, but Dr. Payne noted that elevated levels of ESR and CRP were also common in obese patients. Furthermore, the ESR and CRP findings were from 2009 and did not suggest an inflammation that would be limiting or restricting.[4] Dr. Payne pointed out that, despite Dr. Mossell's various diagnoses for Plaintiff, his notes never mentioned joint damage, destruction, or deformity. Dr. Payne concluded that Plaintiff's pain was not consistent with inflammatory arthropathy and there were no physical restrictions or limitations preventing her from returning to work. (AR 159-60).

After Dr. Payne had submitted his report to Sedgwick, on January 5 Dr. Mossell returned the telephone messages Dr. Payne had left him. Dr. Mossell confirmed that on July 20 and November 3, 2010, Plaintiff had not shown signs of synovitis or effusions. He also related his opinion that fibromyalgia caused most of Plaintiff's symptoms. Based on this call, Dr. Payne confirmed his original opinion in an addendum report on January 11. (AR 173-74).

After receiving Dr. Payne's reports, Sedgwick informed Plaintiff on January 7, 2011 that her disability benefits had been terminated as of December 1, 2010,

---

[4] Dr. Payne reported that, although he did not have the results, he knew some other blood tests had been done. (AR 159).

because she no longer qualified as disabled under the Plan. (AR 163-65). Dr. Payne's telephone conversation with Dr. Mossell did not alter Sedgwick's decision. (AR 176). Again, neither Dr. Payne's reports nor Sedgwick's termination decision had been based on a review of the records from the Greenleaf hospitalization in December 2010 or Dr. Gupta's notes from January 4, 2011, because Plaintiff had not yet submitted those records to Sedgwick.

Frustrated with Sedgwick's decision, Plaintiff hired an attorney and appealed the termination through Sedgwick's internal process. (AR 026-29). For her appeal of July 8, 2011, Plaintiff provided the medical records from her hospitalizations at Greenleaf in August 2009 and December 2010, a letter from Dr. Mossell dated January 31, 2011, and examination records from January 31 and April 28, 2011. Plaintiff also submitted an employability analysis from Earl Thompson. (AR 189-92, 745, 747).

Within weeks of learning that Sedgwick was ending her disability benefits, Plaintiff was seen by Dr. Mossell on January 31. Her chief complaint was knee stiffness, causing her pain when she stood but no swelling, but she did not have any other joint pain or swelling. Her weight was down to 199 pounds, and there was no evidence of active synovitis or effusions. Plaintiff indicated she "[n]eeds letter for disability," and Dr. Mossell continued his diagnoses from prior

examinations, although he added ACD.[5] (AR 465). Blood tests confirmed her inflammation levels were normal. (AR 466).

To assist Plaintiff's appeal, Dr. Mossell wrote an open letter on January 31, 2011, outlining his medical opinion that she suffered from chronic musculoskeletal pain. He listed his diagnoses of seronegative inflammatory arthritis, osteoarthritis, fibromyalgia, depression, memory loss from her medications,[6] and mild obstructive sleep apnea. Admitting that Plaintiff's "current medications have controlled her symptoms," he nevertheless opined that she was disabled as her conditions would exhibit periodic flare-ups and require lifelong treatment. (AR 473).

Following the January 31 examination by Dr. Mossell, Plaintiff also underwent a bone density scan on February 8, 2011. The scan revealed that Plaintiff's left hip was osteopenic. (AR 196-98).

Visiting Dr. Mossell again on April 28, Plaintiff's biggest complaint related to her left shoulder. She was suffering pain, soreness, and swelling in her shoulder, and a scan showed an impingement in the A/C joint.  Although the doctor found no signs of active synovitis or effusions, he diagnosed seronegative

---

[5] Dr. Mossell's notes do not clarify what he meant by the "ACD" diagnosis.
[6] There is no evidence in the medical records themselves of Plaintiff experiencing concentration or memory loss from her medications. In fact, in a December 2011 letter, Dr. Mossell qualified his opinion and wrote that the medications "may" affect Plaintiff's cognitive functions. (AR 066).

inflammation, high risk medications, low vitamin D, osteopenia, and a left shoulder impingement. (AR 471-72).

For her disability appeal, Plaintiff also submitted an employability analysis from Earl Thompson. Thompson is a rehabilitation counselor with an undergraduate degree in psychology and a graduate degree in rehabilitation counseling. He is not a medical doctor. After summarizing the relevant medical records and independent medical opinions in the file, Thompson ascribed greater weight to the opinions of Dr. Mossell than to those of Dr. Payne because Dr. Mossell had physically examined Plaintiff and considered her psychiatric health in reaching his conclusion. Based on Dr. Mossell's opinion, the job requirements for a Walgreens pharmacist, and the Plan's definition of disability, Thompson's report concluded that Plaintiff was vocationally disabled. (AR 749-56).

Receiving Plaintiff's appeal of the termination decision with the accompanying medical records, Sedgwick followed its standard procedures for an appellate review. A new internal examiner, one who had not participated in the initial review, was assigned to the case; the medical records were submitted to Dr. Siva Ayyar, certified in occupational medicine, for a second independent medical opinion; and Dr. Reginald Givens, a psychiatrist, was asked to opine on Plaintiff's psychiatric health. Sedgwick subsequently asked both doctors to

supplement their reports to specifically address whether any side effects of Plaintiff's medications would make her disabled. (AR 013-14, 017, 026).

As an independent physician advisor, Dr. Ayyar concluded that Plaintiff was not disabled as of December 1, 2010. Despite twice leaving voicemails with Dr. Mossell's office, Dr. Ayyar never heard back from Dr. Mossell, so his report was derived solely from Plaintiff's medical file. Dr. Ayyar only commented on medical records created since November 30, 2010. He noted the paucity of medical records from December 1, 2010 forward. Dr. Ayyar further pointed out that Dr. Mossell's own treatment notes sharply conflicted with his conclusion of disability, and there were no objective tests to otherwise indicate Plaintiff's inability to work. Dr. Mossell's treatment records indicated Plaintiff suffered little or no pain, her conditions were stable and well controlled by medications, and the physical examinations showed no restrictions or limitations. (AR 785-88). Nor did Dr. Ayyar find any evidence in Plaintiff's entire medical file that she suffered any adverse effects from medications, including sedation. (AR 795-96).

Sedgwick also asked Dr. Givens to assess whether Plaintiff's psychiatric health qualified her as disabled. Dr. Givens was unable to reach Dr. Anil Gupta. Dr. Givens relied on the records of Plaintiff's hospitalizations in August 2009 and December 2010, as well as Dr. Gupta's treatment notes from January 4, 2011, and concluded that Plaintiff was disabled from her psychiatric condition from

December 24, 2010, until January 4, 2011. (AR 789-92). Moreover, the medical records showed that, when seen by Dr. Gupta on January 4, Plaintiff explicitly denied any side effects from the medications. (AR 797-98).

Receiving the initial and supplemental reports from Drs. Ayyar and Givens, Sedgwick denied Plaintiff's appeal. In a letter dated September 26, 2011, Sedgwick advised Plaintiff that its initial termination of benefits effective December 1, 2010, would be upheld. Because Plaintiff was capable of working on December 1, 2010, her eligibility for benefits ended on that date even though her hospitalization in late December might have restricted her ability to work. Sedgwick pointed to a section of the Plan called "Discontinuation of Benefits" that stated "disability benefits will not be approved (or will end) if…you are medically released to return to work or no longer meet this plan's definition of disability." (AR 803-07).

On January 6, 2012, Plaintiff's attorney made a second appeal of the termination decision and enclosed a letter from Dr. Mossell dated December 22, 2011. (AR 064-67). Dr. Mossell responded to the independent medical opinions and reiterated his belief that Plaintiff was disabled. Agreeing that "her current medications are controlling her conditions," he maintained that the conditions were subject to flare-ups, her symptoms could fluctuate, and her medications could limit concentration and cause psychomotor retardation. (AR 066).

Sedgwick assigned a new internal examiner to oversee Plaintiff's second appeal. (AR 004). Informing Plaintiff's counsel that the second appeal had been filed well outside the ninety-day appeal window as stated in the Plan, Sedgwick re-affirmed the termination of disability benefits, and this litigation ensued. (AR 001). After the administrative record closed, Plaintiff was approved for Social Security disability benefits on March 9, 2012. (Doc. 16-3).

## II.    CONCLUSIONS OF LAW

ERISA allows an individual who has been denied benefits under an employee benefit plan to bring a lawsuit in federal court challenging the benefits denial. 29 U.S.C. § 1132(a)(1)(B); Adams, 694 F. Supp. 2d at 1352. In federal court, the burden of proof lies on the claimant to prove entitlement to the plan benefits under ERISA. Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998) (per curiam). The burden is on the claimant "regardless of whether the claim denial was from the onset of the claimed disability or whether the claim denial was a termination of benefits that had been paid before the denial." Lamb v. Hartford Life and Acc. Ins. Co., 862 F. Supp. 2d 1342, 1349 (M.D. Ga. 2012) (quoting Hufford v. Harris Corp., 322 F. Supp. 2d 1345, 1360 (M.D. Fla. 2004) (internal quotation omitted)).

Although ERISA provides a claimant the right to seek redress in federal court, the statutory language does not give a standard for reviewing benefits

decisions by plan or claim administrators. <u>Blankenship v. Metropolitan Life Ins. Co.</u>, 644 F.3d 1350, 1354 (11th Cir. 2011). In light of ERISA's silence, the Eleventh Circuit has developed a multi-step framework for analyzing ERISA claims and administrators' decisions. The Eleventh Circuit's framework rests on the guidance provided in decisions of the Supreme Court of the United States interpreting ERISA. <u>Id.</u>; <u>Metropolitan Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008); <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The framework is as follows:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision is in fact "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Blankenship, 644 F.3d at 1355. Taking each step in turn, the Court will examine the decision by Sedgwick to deny further disability benefits to Plaintiff.

## A.    Step One: Whether Sedgwick's decision to deny further benefits to Plaintiff was wrong

Following the Eleventh Circuit's framework, the Court must first consider whether Sedgwick's decision to deny Plaintiff continued LTD benefits under the Plan was *de novo* wrong.   Id. at 1355. A claim administrator's denial decision was "wrong" if, under a *de novo* review, the court disagrees with the decision to deny benefits. Glazer, 524 F.3d at 1246. At step one, the court's role is to determine whether it would have made the same decision as the claim administrator, based on the record before the administrator when the decision was made. Id.

Here, Sedgwick's decision to deny continued LTD benefits to Plaintiff was not *de novo* wrong. Plaintiff raises a number of points in arguing the decision was *de novo* wrong, but they are not persuasive. Plaintiff's subjective complaints did not indicate she was disabled as of December 1, 2010. Even if Plaintiff had complained of more intense fatigue and pain, the tests and examinations of Plaintiff do not disclose physical conditions that would have been disabling.

Furthermore, her psychiatric history records a depression that was sporadic in outbreaks and highly responsive to treatment. And far from reflecting dangerous side effects, the record shows that Plaintiff responded well to her medications and did not experience side effects at all.

Contrary to Plaintiff's contention, the few notes in the record mentioning fatigue do not convince the Court Plaintiff was disabled. A sleep study done on January 19, 2010 indicated Plaintiff suffered from mild sleep apnea. (AR 078). However, on July 20, 2010, Plaintiff related to Dr. Mossell that she was able to "rest often." (AR 096). On being admitted to Greenleaf in December 2010, Plaintiff told the staff that she had not been able to sleep well, and so her prescription for Ambien was continued. (AR 332, 601-02). Dr. Gupta kept Plaintiff on Ambien when he examined her on January 4, 2011, but noted her judgment, insight, and cognitive functions were intact. She exhibited no psychomotor retardation. (AR 169). Despite reiterating his diagnoses of mild sleep apnea and fatigue in letters dated January 31 and December 22, 2011, Dr. Mossell concluded Plaintiff's symptoms were well controlled by medications. (AR 066, 473). Plaintiff has evidently suffered from insomnia, but there is insufficient evidence that fatigue disables her.

Moreover, the Court is not persuaded by Plaintiff's argument concerning her subjective complaints of pain as reflected in the treatment notes. For

instance, although Plaintiff complained of suffering from pain when she first arrived at Greenleaf on August 18, 2009, treatment notes from August 21 and 22, the day she was discharged, show she had no pain. (AR 262, 264). When Plaintiff visited Dr. Mossell on January 11, 2010, she complained of fecal incontinence but indicated no joint pain. (AR 077). When she saw him again on April 12, 2010, her pain was only a 2 on a scale of 1-10. (AR 090). On July 20, she had "no complaints." (AR 096). She described less than severe jaw pain and limited joint pain on November 3. (AR 142). When Plaintiff was hospitalized again at Greenleaf from December 24-29, 2009, she did not indicate physical pain on any day she was there. (AR 676-78, 680, 682, 684, 686). Plaintiff was experiencing some knee stiffness and pain but complained of no other pain to Dr. Mossell on January 31, 2011. (AR 465). Her biggest complaint on April 28, 2011 related to pain from a left shoulder impingement. (AR 471-72).

Furthermore, the medical tests, findings, and examinations in the administrative record do not elevate the limited instances Plaintiff subjectively complained of pain to the level of a disability. The Court recognizes subjective complaints of pain may not be summarily disregarded. Oliver v. Coca-Cola Co., 497 F.3d 1181, 1196-97 (11th Cir. 2007) (vacated in part by Oliver v. Coca-Cola Co., 506 F.3d 1316 (11th Cir. 2007)). Plaintiff's blood work confirmed she rarely experienced pain, indicating her medications had stabilized her symptoms. From

August 2009 through January 2011, the record demonstrates that Plaintiff's blood was regularly tested for its ESR and CRP levels. Although her levels were evidently elevated in October 2009, from January 11, 2010 until the last blood test recorded in the administrative record on January 31, 2011, Plaintiff's CRP levels were normal, and her ESR levels were either normal or else barely outside the normal range. (AR 080, 091, 098, 150, 158-59, 466, 486). The blood testing does not indicate inflammation that would have disabled Plaintiff from working as a pharmacist.

Although Dr. Mossell, Plaintiff's treating physician, has opined that Plaintiff is permanently disabled, his opinion conflicts with his own physical examinations of Plaintiff. He repeatedly indicated she was "doing well on her current medications." (AR 090). His treatment notes record only infrequent complaints of pain and no evidence of active synovitis or effusions. (AR 078, 090, 098-100, 142, 465, 471-73). On the occasions when Dr. Mossell did observe Plaintiff's pain, it was in relation to a specific problem: TMJ on November 3; knee stiffness on January 31; and an impingement of the A/C joint in Plaintiff's left shoulder on April 28. (AR 142, 465, 471-72). His records do not reflect continuing issues with pain that would be consistent with disability.

The medical descriptions of Plaintiff's physical mobility likewise indicate she was able to work as a pharmacist on December 1, 2010. When examined at

Greenleaf in August 2009, she exhibited normal range of joint motion, full motor strength, and the ability to engage in all physical activity except strenuous exercise. (AR 232-36). A musculoskeletal examination by Dr. Mossell on April 12, 2010, showed Plaintiff possessed "[g]ood mobility in all four extremities." (AR 090). In December 2010, when Plaintiff returned to Greenleaf, she was able to engage in all physical activities, and her bones, muscles, joints, and extremities were all normal. (AR 626-30).

Nor does the administrative record provide convincing evidence Plaintiff was disabled from her psychiatric condition, either alone or in conjunction with her physical ailments. For thirty years Plaintiff was sufficiently able to overcome her depression to work as a pharmacist. (AR 519-20). She did admit herself to Greenleaf in August 2009 and December 2010, but she did not see a mental health provider in the interim period. After both hospitalizations, her thinking was normal, without hallucinations or delusions, and her memory, judgment, and insight were intact. (AR 486-87, 01-04). The depressive episode in December 2010 was primarily due to financial worries, a condition that could have been relieved by Plaintiff returning to work. (AR 604). Seen by Dr. Gupta on January 4, 2011, Plaintiff's cognitive functions, judgment, insight, and concentration were intact, and she discussed an upcoming job interview. (AR 169).

More significantly, Plaintiff's treating psychiatrist has never determined she is disabled. Dr. Gupta did estimate Plaintiff had a low GAF score both times she came to Greenleaf, but he had raised her score to 55 before her discharge in December 2010, and he had estimated she could reach a GAF range of 55-60. (AR 490, 603, 700). Furthermore, there is no evidence he attempted to dissuade her from attending the job interview mentioned during the January 4, 2011 visit. At best, for purposes of Plaintiff's disability claim, the evidence in the administrative record shows Plaintiff suffered significant depressive episodes sixteen months apart, and on the darkest days of those episodes she could not have worked well. Her psychiatric condition does not indicate a total disability from her own profession.

Plaintiff also maintains the employability analysis from Earl Thompson proves her disability. Regardless of whether Sedgwick failed to consider Thompson's report as Plaintiff contends, this Court has done so but finds serious flaws in the employability analysis. First, as Thompson seemingly failed to grasp, a medical opinion is not inherently flawed solely because it was derived from a paper review rather than a physical examination. *See* Blankenship, 644 F.3d at 1357; Hermann v. Metropolitan Life Ins. Co., 689 F. Supp. 2d 1316, 1326-27 (M.D. Fla. 2010). Neither Sedgwick nor this Court is required to prefer Dr. Mossell's conclusion Plaintiff was disabled over Dr. Payne's opinion she was not,

merely because Dr. Mossell physically examined her. Second, even if Dr. Payne failed to address Plaintiff's psychiatric health as Thompson pointed out, Dr. Givens did subsequently consider this issue for Sedgwick. Third, Thompson failed to reconcile or even consider the clear conflict between Dr. Mossell's conclusion of physical and psychiatric disability with the daily treatment notes recording little pain, infrequent insomnia, unrestricted physical mobility, and symptoms well controlled by medications. In sum, Thompson's report lacks the clear-eyed insightfulness that would have made its conclusion compelling.

Even less persuasive is the contention Plaintiff can no longer work because of negative side effects from her medications. The administrative record lacks any evidence Plaintiff was suffering negative, much less dangerous, side effects. On August 22, 2009, and January 4, 2011, Dr. Gupta expressly indicated Plaintiff was not experiencing any negative side effects from her medications, and Dr. Mossell observed that Plaintiff "was doing well on her current medication" on April 12, 2010. (AR 090, 169, 487). Two of Dr. Mossell's letters raise the possibility medications could restrict Plaintiff's mental activity; however, there is no evidence they actually did. (AR 090, 473).

Finally, Plaintiff's successful application for Social Security disability ("SSD") benefits does not convince the Court that Sedgwick's decision to terminate benefits was *de novo* wrong. At step one of the Eleventh Circuit's

ERISA analysis, the Court's review is limited to the administrative record that was before the claim administrator at the time of its benefit decision. *See* Glazer, 524 F.3d at 1246. Sedgwick first terminated Plaintiff's LTD benefits on January 7, 2011, and then affirmed its denial decision on January 17, 2012, following Plaintiff's second appeal. (AR 069-70, 163-65). As demonstrated by the fact that the administrative record contains no mention of Plaintiff's receipt of SSD benefits, Plaintiff was not approved for SSD benefits until March 9, 2012, *after* the administrative record had closed. (Doc. 16-3). The SSD decision was not before Sedgwick when it ended Plaintiff's benefits, and so, following Eleventh Circuit precedent, this Court's *de novo* review will not consider that decision either. Glazer, 524 F.3d at 1246; Carnaghi v. Phoenix Am. Life Ins. Co., 238 F. Supp. 2d 1373, 1377 (N.D. Ga. 2002).

Thus, a complete review of the administrative record shows that Sedgwick's decision to terminate Plaintiff's LTD benefits because she no longer met the Plan's definition of disability was *de novo* correct. Defendants' Motion for Summary Judgment must be granted, and Plaintiff's Motion for Judgment must be denied.

## B.    Step Two: Whether Sedgwick was vested with discretionary authority under the Plan

Assuming *ad arguendo* that Sedgwick's decision to terminate Plaintiff's LTD benefits was *de novo* wrong, the Court must move to the second step in the

analysis and ask whether Sedgwick had been given discretionary authority under the Plan. Blankenship, 644 F.3d at 1355. Here, the Plan explicitly states that the "authority granted to the Claim Administrator…to construe and interpret the Plan and make benefit determinations, including claims and appeals determinations, shall be exercised by them…as they deem appropriate in their sole discretion." (Doc. 15-4, pg. 17). Plaintiff concedes that Sedgwick had the discretionary authority to interpret the Plan and make benefit decisions. Because Sedgwick was vested with discretionary authority, the Court must ask whether the decision to terminate benefits was reasonable.

## C.   Step Three: Whether Sedgwick's decision to deny further benefits was "reasonable"

Even if Sedgwick's decision to terminate Plaintiff's LTD benefits was *de novo* wrong, it was certainly not arbitrary or capricious, for there was a reasonable basis for denying Plaintiff's claim. At step three of the analytical framework, the Court must apply an arbitrary and capricious standard and determine whether Sedgwick's decision to deny additional benefits was "reasonable." Blankenship, 644 F.3d at 1355. The Court asks only if there is a "reasonable basis" to support the claim administrator's decision to deny benefits. Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1140 (11th Cir. 1989). If reasonable grounds exist, then the Court must defer to the claim administrator and uphold the decision "even if there is evidence that would

support a contrary decision." Blankenship, 644 F.3d at 1355-56 (quoting White v. Coca-Cola Co., 542 F.3d 848, 856 (11th Cir. 2008) (internal citations and quotation marks omitted)). The Court must review both the claim administrator's decision and construction of the plan at issue, but the review is limited to the administrative record that was before the claim administrator when it made its decision. Glazer, 524 F.3d at 1246.

The same reasons the Court concluded Sedgwick's decision to terminate Plaintiff's LTD benefits was *de novo* right even more strongly establish that Sedgwick's decision was reasonable. Sedgwick could reasonably question whether Plaintiff's subjective complaints of pain, as reflected in the medical records, were consistent with a disbility. Sedgwick could reasonably conclude from the blood work, physical examinations, and evaluations from Plaintiff's treating physicians that her physical abilities were not restricted and her symptoms were well controlled by medications. Plaintiff's sporadic psychiatric treatment also affords reasonable grounds for a claim administrator like Sedgwick to think she suffered from depression of limited intensity that could be controlled with proper care.

In addition to the medical records, Sedgwick's internal handling of Plaintiff's claim demonstrates it did not act arbitrarily or capriciously in terminating her benefits. After Plaintiff exhausted her short-term disability benefits, Sedgwick

approved Plaintiff's claim for LTD benefits from February 13–November 31, 2010. (AR 086, 093, 124, 145). Once Sedgwick began considering whether Plaintiff continued to qualify for LTD benefits under the Plan, it strictly complied with the terms of the Plan in analyzing her claim. For each of Plaintiff's appeals, Sedgwick appointed a new internal analyst to oversee the file. Sedgwick hired two independent physicians and one independent psychiatrist to review Plaintiff's medical records and provide opinions on Plaintiff's purported disability. Only after all of the independent medical opinions stated Plaintiff was not disabled did Sedgwick ultimately deny Plaintiff's claim.

Plaintiff's arguments for the unreasonableness of Sedgwick's decision are unpersuasive. Neither Sedgwick nor the independent doctors it hired ignored the opinions of Plaintiff's treating physicians. Finally successful in reaching Dr. Mossell, Dr. Payne was not convinced of Plaintiff's disability by their conversation. (AR 173). Dr. Siva Ayyar was unsuccessful in several attempts to communicate with Dr. Mossell, but he did read Dr. Mossell's records. (AR 785). Likewise, Dr. Reginald Givens tried but failed to reach Dr. Gupta. (AR 789). Sedgwick was not required to give special consideration to Plaintiff's treating physicians, but could accord greater weight to the opinions of Drs. Payne, Ayyar, and Givens without acting arbitrarily or capriciously. *See* Blankenship, 644 F.3d at 1356. And although Sedgwick delegated separate doctors to review Plaintiff's

mental and physical conditions, it considered both aspects of Plaintiff's health in determining her benefit eligibility. (AR 803-07).

Apart from a general argument, Plaintiff has not cited to the record in support of her contention that Sedgwick ignored the employability analysis by Earl Thompson. Even assuming this did occur, the Court has examined Thompson's report and is not persuaded by his conclusion. Thompson based his preference for Dr. Mossell's medical opinions, in part, on a prejudice against paper reviews that neither Sedgwick nor the Court is required to follow. If Dr. Payne's report did not analyze Plaintiff's mental health, Dr. Givens did report on Plaintiff's psychiatric health at Sedgwick's request. Finally, Thompson never addressed the evident conflict between Dr. Mossell's conclusion Plaintiff was disabled with the evidence seen in the doctor's daily treatment notes.

Nor was the decision to terminate Plaintiff's benefits unreasonable because Sedgwick's independent physician advisors performed a paper review of her medical records rather than examine her in person. There is nothing inherently objectionable in using paper reviews as opposed to physical examinations. *See* Blankenship, 644 F.3d at 1357; Hermann, 689 F. Supp. 2d at 1326-27. The Plan did not guarantee Plaintiff an independent medical examination would be done if Sedgwick decided to deny benefits, only that Sedgwick might request such an examination. (Doc. 15-4, pg. 15).

Thus, Plaintiff's motion for judgment must be denied because Sedgwick's decision to terminate her LTD benefits was reasonable under an arbitrary and capricious standard. According Sedgwick's decision proper deference under this standard, the Court concludes a reasonable basis for denying Plaintiff's claim is found in the administrative record.

### D.   Steps Four and Five: Whether Sedgwick operated under a conflict of interest

Because this Court is stating what its ruling would be had it been necessary to consider Sedgwick's decision under an arbitrary and capricious standard, it is appropriate to briefly address Plaintiff's contention that Sedgwick operated under a conflict of interest as claim administrator. The Court finds Plaintiff's contention to be without merit. At step four of the test, the Court must ask whether the claim administrator operated under a conflict of interest in reaching its decision and, if not, then end its analysis at step five. Blankenship, 644 F.3d at 1355. An administrator that both determines eligibility for benefits and pays out benefits has a conflict of interest. Id. (citing Glenn, 554 U.S. at 112). Even where a conflict of interest exists, however, the plaintiff has the burden of proving how the conflict rendered the denial decision arbitrary, for the conflict must have "inherent or case-specific importance." Id. (quoting Doyle v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1360 (11th Cir. 2008) and Glenn, 554 U.S. at 117) (internal quotation marks omitted)). If there is a conflict of interest,

the Court will only consider this as one factor in its arbitrary and capricious review. Id.

Sedgwick did not operate under a conflict of interest, and Plaintiff has entirely failed to prove how any potential conflict influenced Sedgwick's decision. Under the terms of the Plan, Sedgwick served as claim administrator to make eligibility decisions while Walgreens, as the plan administrator, would pay any benefits that were approved. (Doc. 15-4, pgs. 6, 16). Faced with this clear division of authority, Plaintiff's specious arguments for a conflict of interest fail.

First, Plaintiff argues that a conflict of interest existed because Walgreens reserved the authority to review Sedgwick's decisions under the terms of the Plan. Plaintiff is correct in stating the Plan reserved this right for Walgreens. (Doc. 15-4, pg. 16). This reservation may have created the potential for a conflict of interest, but it did not create any such conflict here because the record is clear that Walgreens never exercised this right of review for Plaintiff's claim. The decision to terminate Plaintiff's benefits was made by Sedgwick alone, as Plaintiff concedes. (Compare Doc. 15-1, ¶5 with Doc. 21, ¶A).

Second, Plaintiff maintains that Sedgwick's "generalized economic incentive" to save Walgreens money and obtain future business created a conflict of interest. (Doc. 16-1, pg. 22). Were Plaintiff's argument accepted, a plan administrator could never avoid a conflict of interest because any independent

third party hired as a claim administrator would be subject to this charge. Delegating benefit decisions to an independent third party successfully avoids the conflict of interest. Pointing to a "generalized economic incentive," without more, does not create a conflict of interest. Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey, 663 F.3d 1124, 1133 (10th Cir. 2011) (citing Finley v. Hewlett-Packard Co. Empl. Benefits Org. Income Prot. Plan, 379 F.3d 1168, 1176 (10th Cir. 2004)). The economic incentive cuts both ways. A claim administrator might also be tempted to approve benefit applications to preserve its reputation for fair dealing. Blankenship, 644 F.3d at 1357 (citing Marrs v. Motorola, Inc., 577 F.3d 783, 787 (7th Cir. 2009)).

In sum, the decision to terminate Plaintiff's LTD benefits did not involve a conflict of interest, so this Court need not reach the sixth step of the analytical framework. Plaintiff has failed to show that a conflict of interest should be factored into the arbitrary and capricious review. The decision to terminate Plaintiff's benefits was *de novo* correct, but even if not, it was certainly reasonable under an arbitrary and capricious standard.

## III.  CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment (Doc. 15-2) and denies Plaintiff's Motion for Judgment (Doc. 16). Judgment is due to be entered for Defendants and this case dismissed.

**SO ORDERED**, this the 11th day of September, 2013.

       ***s/ Hugh Lawson***
       HUGH LAWSON, SENIOR JUDGE

scr